# CHARLESTON.

Di Bacco *et al.* v. Benedetto *et al.*

Submitted February 26, 1918.   Decided March 19, 1918.

1. Questions Raised But Not Decided.

   Whether, in a suit brought to cancel as forged and fraudulent a recorded release of a deed of trust lien wherein the bill does not aver nonpayment of the debt secured but in general terms that the deed is "still a valid and subsisting lien" on the property conveyed, an answer which, after admitting the execution of the deed and affirming the genuineness of the release, avers payment and overpayment of the indebtedness prior to the execution of the release and points out fatal defects in its acknowledgment and prays a recovery of such overpayment and a decree requiring plaintiff to execute and deliver a release in due form, is merely defensive to the bill and does or does not constitute a cross bill for affirmative relief, are questions raised but not decided.   (p. 87).

2. Question Not Decided.

   As is also the further question whether, if the answer is a cross

bill such as requires a special reply under section 35, ch. 125, Code, the requirement is waived by the taking of depositions in its support before a hearing in the cause, so as later to admit evidence by plaintiff of nonpayment of the indebtedness, in a trial of an issue out of chancery of payment and the genuineness of the release, where during and after the trial respondent makes due and persistent objection to evidence as being inadmissible without such reply and moves for a decree in his favor based on the state of the pleadings and the court overrules his objection and motion, confirms the verdict and on it bases a decree granting the relief sought by the bill over respondent's protest predicated upon the same objection. (p. 87).

3. MORTGAGES—*Release—Fraud—Burden of Proof.*

Ordinarily, upon him who affirms a fact necessary to obtain the relief sought, in this case the cancellation of an alleged forged release of a deed of trust lien, rests the burden of proving the fact averred. (p. 91).

4. EVIDENCE—*Burden of Proof—Test.*

A fairly accurate though not an infallible test for locating the burden of proof is, which party to an action or suit will fail if he offers no evidence competent to show the fact averred as the basis for the relief he seeks to obtain. (p. 91).

5. SAME—*Books of Original Entry—Authentication.*

Books of original entries of a private banker kept by him and his clerk or bookkeeper in the customary method in the regular course of business, the transactions being within the personal knowledge of the entrants who identify them and authenticate the entries, are admissible in evidence without judicial reflection upon their identity and authenticity and evidentiary value, subject, however, to the right of the jury to give them only such weight as they may deem the books entitled to when considered in the light of other proof submitted for their consideration. (p. 92).

6. EQUITY—*Interlocutory Order—Verdict—Decree.*

A verdict rendered upon an issue directed by an interlocutory order entered in a chancery cause has no force or value except as it enables the court to arrive at a just conclusion upon the merits of the controversy presented for adjudication. The chancellor may if satisfied approve it and thereon predicate a decree, or if dissatisfied disapprove it and render such decree as may seem right and just notwithstanding the verdict, or may award a new trial. (p. 90).

7. APPEAL AND ERROR—*Equity—Approval of Erroneous Verdict—Review—Decree.*

But if he approve an erroneous verdict and thereon predicate a

decree, it will be reversed on appeal as also erroneous, and such decree will be entered here as he should have entered upon a consideration of the facts proved upon the trial of such issue. (p. 90).

Appeal from Circuit Court, Tucker County.

Bill in equity by Vinanzio Di Bacco and others against R. D. Benedetto and others, with cross-bill by Benedetto. Decree for complainants, and defendant R. D. Benedetto appeals.

*Reversed, decree for defendant.*

*Samuel T. Spears, C. O. Strieby,* and *J. Wm. Harman,* for appellant.

*A. Jay Valentine, A. R. Stallings, D. E. Cuppett,* and *Conley & Johnson,* for appellees.

LYNCH, JUDGE:

By bill in equity, plaintiffs charge that in 1913 the defendant R. D. Benedetto, by deed duly executed and recorded, conveyed to D. E. Cuppett, trustee, certain real estate to secure them in the payment of $18,000, which instrument they say "is in full force and effect and is a valid and subsisting lien upon all the property therein described"; and that thereafter, on February 21, 1916, the grantor secretly and fraudulently forged and caused to be admitted to record by his co-defendant, H. F. Colebank, clerk of the county court of Tucker County, a paper purporting to be a release of the lien, but which is void and illegal, because of its falsity and of fatal defects in its acknowledgment. They pray a cancellation of the alleged release and a restoration of the record of their lien.

By the answer of Benedetto, the indebtedness and the execution of the deed are admitted; but he denies the fraud and forgery alleged, or that the deed is still a subsisting lien against the property conveyed. And, by way of what he deems a cross bill, in the answer he avers that the indebtedness secured was repaid, and by mistake overpaid to the extent of $194.40, and that thereafter plaintiff did in fact execute and deliver to him the release in question; wherefore he prays a recovery for the sum so overpaid, and the execution

of a release in due form if it shall be determined that the one actually executed is in law imperfect or insufficient to discharge the trust lien. To the answer there was a general replication, but no special reply.

After the parties had taken depositions in support of the pleadings, the court, by interlocutory order, directed a trial at law of two issues, namely, whether plaintiffs did execute and deliver to defendant the release mentioned in the bill, and whether he had paid the notes secured by the deed of trust. It was agreed by the parties that the evidence offered upon the trial should consist of the depositions theretofore taken, the exhibits filed, and "such additional papers and writings as the parties may desire to offer" after due notice given to the opposite party. The jury impaneled to try the issues found that plaintiffs did not execute or deliver the release, and that defendant had not repaid the debt secured except in the sum of $4,000; upon the basis of which verdict the court, in the decree complained of on this appeal, cancelled the release and directed Colebank to record the decree in his office and to note it upon the margin of the book in which the deed was recorded.

One of the two principal contentions of the appellant is that the court erred in admitting on the trial, or considering when rendering the final decree, the evidence offered to show nonpayment of the debt, in the absence of a special reply to the answer. The court overruled his motions to reject such evidence and to enter a decree for the affirmative relief sought upon the state of the pleadings. The other contention is that the court erred in refusing to set aside the verdict because of certain alleged errors committed during the course of the trial, and to render a decree for him upon the law and the evidence notwithstanding the verdict.

Does the answer within the meaning of sections 35 and 36, ch. 125, Code, contain "any new matter constituting a claim for affirmative relief", which if not controverted by special reply must for the purposes of the suit be taken as true? The statute was not designed to change the character or enlarge the scope of a cross bill. Its function and availability remain as at common law. With view to avoid multiplicity of suits

and facilitate the reasonably prompt disposition of causes on the merits, the legislature deemed it wise to permit the insertion of the claim for affirmative relief in the answer, without resort to a separate pleading. Beyond this there was no intention to go; and the usual principles applicable to the latter pleading now apply and govern the new matter so alleged by the respondent in his answer. Hence, where the answer, although praying affirmative relief, avers, in addition to the denial of the allegations of the bill, only such new matter as could be set up by way of defense, no special reply is required; but a general replication is sufficient to put defendant upon proof of such new matter. *Smith* v. *Turley*, 32 W. Va. 14; *Fulmer Coal Co.* v. *Railroad Co.*, 57 W. Va. 471; *Hager* v. *Melton*, 66 W. Va. 62; *Cunningham* v. *Hedrick*, 23 W. Va. 579. In other words, as these and other decisions say, if the defense is such as could, under the former practice, have been made by answer, no reply under the statute is necessary, and the new matter is not taken for true if a general replication is filed. This rule applies in all cases where the prayer for affirmative relief is predicated upon the matters substantially set forth in the bill, and introduces nothing new except facts tending to negative charges in plaintiff's pleading.

But it is equally true that a cross bill is proper and necessary whenever the defendant has equities arising out of the subject matter of the suit which entitles him to affirmative relief not otherwise obtainable therein. *Vinal* v. *Oil & Land Co.*, 14 W. Va. 637; *Goff* v. *Price*, 42 W. Va. 385; *Cunningham* v. *Hedrick*, 23 W. Va. 579; *Middleton* v. *Selby*, 19 W. Va. 168; *Freeman* v. *Egnor*, 72 W. Va. 830. By the terms of the statute, he is permitted to aver in the answer any such new matter as would entitle him to affirmative relief if alleged in a separate cross bill, with proper prayer, "in the same manner and with like effect" as if a cross bill had been filed. And ordinarily, according to the strict rules of procedure, such cross complaint is essential to the granting of any affirmative relief. Certain exceptions to the rule are thus noted in *Railway Co.* v. *McGarry*, 42 W. Va. 399: "There are two important classes of cases in which the court gives

relief to the defendant without a cross bill—suits for an account, in which, if it finally appears that the balance is in favor of the defendant, the court will give him a decree for the sum found to be due him; and bills for specific performance of contracts, in which, if the parties differ as to the terms of the contract, and that question is decided in favor of the defendant, the court will compel the plaintiff to perform the contract thus established. But these exceptions illustrate the rule, for they proceed distinctly upon the theory that the court only entertains such bills upon the condition that the plaintiff will consent to the same justice being rendered to the defendant that he asks for himself, and formerly this consent was required to be expressly given in the bill.''

Where a cross bill is proper or necessary and is filed, it becomes in effect a subsidiary or auxiliary suit, but ordinarily it does not fall with the dismissal of the original bill. It is competent for the court to dismiss the plaintiff's case, and afterwards treat and proceed with the cross bill as an original bill for relief. ''As a means of defense it may be said to have accomplished its object in that respect, when the original bill is dismissed by the court; but so far as related to the matters set up therein, as to which it prays affirmative relief, its legitimate purpose and office has not been attained,'' and dismissal of the original bill does not dispose of the cross complaint, upon which the court must thereafter adjudicate the rights which it asserts. *Vinal* v. *Oil & Land Co.,* 14 W. Va. 698; *Pethtel* v. *McCullough,* 49 W. Va. 524. Where the cross bill or answer is simply defensive, or equity is without jurisdiction in the main suit, such defensive matter is embraced in a general dismissal. *Spies* v. *Railroad Co.,* 60 W. Va. 390. But, as already stated, such dismissal does not carry with it an answer setting up facts calling for affirmative relief. *Pile* v. *Henderson,* 65 W. Va. 39; *Assurance Society* v. *Wilson,* 110 Va. 571.

It is not necessary, however, to base the decision upon the statute with whose provisions plaintiffs did not comply, since they failed to file or tender the special reply required by sections 35 and 36, chapter 125, Code, to the answer of the defendant in so far as it sets up, if at all, ''any new mat-

ter constituting a claim for affirmative relief.'' Such mat-
ter alleged in an answer, when not controverted by such reply,
entitles a plaintiff under the sections to a decree or verdict,
as the case may be, in his favor. The substantial facts in-
volved and those upon which depend a just determination of
the rights of the parties, the plaintiffs and the defendant,
were developed sufficiently upon the trial of the issue out of
chancery directed by an order entered in the cause while it
was pending in the court below, to enable us to dispose of the
cause upon its merits without considering and finally deter-
mining whether the answer does or does not aver such new
matter as required a special reply. This course is warranted
by the motions of the defendant, referred to, to set aside the
verdict and decree for him upon the law and facts proved,
notwithstanding the verdict.

If, as claimed by defendant, the court misdirected the jury
and permitted the introduction of inadmissible testimony and
excluded competent proof, oral and documentary, sufficient
to deprive the verdict of its advisory quality, the errors so
committed may also have rendered erroneous the decree pro-
nounced in the case.

The finding of a jury upon such an issue has no force or
value except in so far is it may enable a court of equity to ar-
rive at a just conclusion upon the merits of a controversy
before it for adjudication. The chancellor may approve and
predicate his decree upon it, or, if dissastisfied, disapprove
it or award a new trial or disregard it and decree as he thinks
the law and evidence requires without the aid of a second
jury. But if he approves a finding unwarranted by the
facts proved and which, but for the errors committed during
the trial, ought to have been different, the errors will also
vitiate the decree based upon it. The vice of the one inheres
in the other. In *Nease* v. *Capehart,* 15 W. Va. 299, 306, it
was said: ''It is true that the object of directing the issue
is to satisfy the conscience of the chancellor; but that con-
science must be satisfied with the verdict of the jury upon an
issue properly directed, where no errors have been commit-
ted during the trial thereof, either by the court or jury to
the prejudice of either party. *Henry* v. *Davis,* 7 W. Va. 715.''

Errors committed during the trial is the significant qualifying phrase. That such errors were committed both as to the directions given and as to the rulings upon the admissibility of the proof offered there can be no doubt; nor that the decree itself is wrong independent of the verdict which it approved and adopted.

The manifest object of the suit is the cancellation of the paper purporting to be executed by plaintiffs and to be a release of the deed of trust lien for $18,000 on valuable real estate owned by the defendant in Thomas and which release plaintiffs charge is a forgery. The legality of that paper is a vital element or factor in the determination of the issues arising upon the record. Upon the defendant the court placed the burden of proving its due execution, validity and genuineness, notwithstanding the averments of the bill that it is a forgery. Ordinarily, on him who affirms the existence of a fact or thing necessary to obtain the relief he seeks rests the burden of establishing that fact or thing. 1 Jones on Evidence, § 178. A fairly accurate test as to the proper location of the burden of proof is which party would be defeated if no evidence were offered upon the issues raised by the pleadings. *Clifton* v. *Weston*, 54 W. Va. 250, 260; 11 Am. & Eng. Enc. Law (2nd Ed.) 335; 10 R. C. L. 898, 900. Upon the trial of the accused under an indictment charging the forgery of an instrument of a like character, would it not be the duty of the state to establish the fact charged? If no proof were offered either by the state or the accused, an acquittal necessarily would ensue, and would not the same result in effect have followed had neither party to this controversy offered any proof touching the validity and genuineness of the release? If the release is not genuine it is fraudulent, and where fraud is relied upon by the one who is injured by it, he must, to succeed, clearly establish the nature and character of the fraud pleaded or no relief can be given him. This is the general rule, although there may be circumstances which will shift the burden of impeachment to the party who is benefitted by the transaction, as in the case of fraudulent conveyances by a husband to his wife or de-

'pendent relatives.    But to vary the rule there must be some
circumstances that qualify or alter its application.

By rulings upon the admissibility of documentary proof
offered and rejected and upon instructions given for plain-
tiffs and upon instructions requested by defendant and not
given, the effect of the verdict was rendered erroneous and
hence inconclusive upon the issues involved.    The documents
thus substantially deprived of their probative value upon the
claim of payments, which the defendant sought to prove by
them he made in satisfaction of the indebtedness secured by
the deed of trust, are books kept by him to show the accounts
of his patrons for money deposited with him as a private
banker.    They were identified and authenticated, one as a
book of original entries made in the usual course of banking
business transacted between defendant and his depositors,
the other as a ledger into which the entries were posted in
the manner usually followed in such business.    When first
tendered, the court refused to admit them for any purpose
but later admitted them for a qualified purpose, namely,
merely as memoranda to refresh the recollections of the wit-
nesses who were familiar with the transactions contained in
and vouched for by the books and who clearly identified
them and the purposes to which they were devoted and the
time and manner of making the entries in them and who tes-
tified with respect thereto.    Finally, however, the court did
admit them but by an instruction still further qualifying their
evidentiary force and value—to say the least it is not free
from ambiguity—submitted to the jury the question whether
the daybook was in fact what it purports to be, a book of
original entries kept by defendant to record daily receipts and
disbursements of money; whether the entries were made in
the usual course of such business and on the dates they ap-
pear therein; limited their effect as proof only of the "res
gestae" and as corroborative of the witnesses, Benedetto and
Ragonese, "if it does so corroborate" them, but "in so far
only as" to show the manner in which the said day book and
ledger were kept and entries therein made, and to give them
only such weight as in the opinion of the jury they corrobo-
rate the evidence of said witnesses; "but neither of said books

nor the entries therein can be considered by the jury as evidence that the money was in fact paid or loaned to the plaintiffs, as shown by said books, or the dates of such payments or loans, except so far as the books, or the entries therein, from their appearance, may corroborate the evidence of said Benedetto and his bookkeeper as to such payments or loans.''

The only proof challenging the authenticity and verity of either book and the regularity of the entries in them as regards the payments involved is the uncorroborated statement of one of the plaintiffs that when he examined the ledger, the page therein on which the account between them and the defendant was posted was not then in that book. He does not, however, say the several items so collected were not in the daybook. His testimony and that of Benedetto and Fred Ragonese, his clerk and bookkeeper, clearly establishes the identity of the ledger, and that of Benedetto and Ragonese the identity of both books, many of the entries in each being made by one or the other of them in his own handwriting. These entries they also verified. With their authenticity and verity sufficiently established to render them admissible in evidence, were the rulings prescribing the limitations upon their evidentiary value lawful and proper?

The entries in the daybook apparently were made in the due and orderly conduct of the business transactions represented by them. Together with other Italians plaintiffs were the customers of Benedetto. They were connected by marriage, their sister being Benedetto's wife; they were partners with him in the saloon business; their social and business relations were cordial and intimate during these transactions, and were disturbed only after this controversy arose. The Di Baccos admit knowledge of the character of Benedetto's business, its extent and scope; confess the receipt of money borrowed of him, but insist they repaid it. Does not this testimony abundantly warrant the conclusion that the books possessed a higher degree or quality of proof than was accorded to them during the progress of the trial and do they not tend strongly to sustain the claim of Benedetto as to these payments?

The daybook satisfies each of the four conditions of admissibility prescribed in *Vinal* v. *Gilman,* 21 W. Va. 301: it is a book of original entries; the entries apparently were contemporaneous, or virtually so, with each transaction; were made in the regular course of business; and the entrants had personal knowledge of the transactions. The right to have the benefit thereof as primary evidence of the facts it discloses, free from any judicial suspicion expressed in the hearing of the jury in so far as they relate to the matters in dispute, is supported also by *Architects & Builders* v. *Stewart,* 68 W. Va. 506 and *Deitz* v. *McVey,* 77 W. Va. 601. Subject to the qualified right of the court or jury, as the case may be, to test the regularity of the entries and the effect to be given to them, the books should have been submitted without reflection upon their probative value.

The next question for determination is whether the proof satisfactorily shows that the controverted payments actually were made, as Benedetto claims they were, in discharge of the indebtedness involved; whether he has paid more than was due on that account, and if so whether the Di Baccos executed the release and the receipt also involved.

The four thousand dollar payment on the debt secured is admitted. It discharged two notes, each for two thousand dollars, which were surrendered to defendant, not promptly, but finally; and he produced them at the trial. Combined, the credits, except the $4,000 payment admitted, exhibited by the books and which cover the period from February 10, 1914 to February 22, 1915 and being in amounts ranging from $150.00 to $2370.00, aggregate $16,350.00 for which the receipt in question was given as of the last date and the release on the following day, if either is valid. Both are to be considered as factors in determining the matters in issue upon this writ.

These several items appear in the daybook as original entries apparently with the same regularity and in the same order as the items of transactions with other customers. Evidently it was not kept nor the entries made by a skillful penman, clerk or cashier. They are written in Italian and hence not readily understood by one not versed in that language,

though of course the numerals are familiar and intelligible. These primitive or inartistic methods of bookkeeping do not necessarily impeach or discredit them, nor is there anything there that does so; nothing which reasonably can be said to raise an insuperable objection to their admissibility as evidence of the accuracy of their contents. If made as they purport to have been, they sustain the contention that what they show actually occurred as to the financial matters now being investigated, especially when corroborated by the receipt and the release, to each of which we now refer.

Neither of these papers was produced, nor could they be, if it be true that they ever had a tangible existence, since both were lost or stolen, defendant says, while he was in Pittsburgh in February 1916, though the release was admitted to record and recorded, of which a certified copy is in the record, on the day he departed for that city. Witnesses to whom Benedetto exhibited each paper testify to his having them in his possession. One or more of them saw and examined each paper and recognized and identified the signatures of the two Di Baccos, with which they said they were familiar. While some of them saw one paper only, others saw both. They seem to be frank and intelligent witnesses, nor is their testimony impeached or contradicted. To Smith, a practicing attorney, Benedetto delivered the release and asked to be advised whether after the lapse of one year it had any legal effect or was recordable, he apparently having some doubt upon that subject; and being assured he further requested Smith to have it recorded, and accordingly it was recorded and redelivered to Benedetto, who thereafter lost it. The receipt and the signatures thereon also were identified substantially by at least two persons who saw it. The loss of valuable papers is not an extraordinary occurrence, indeed it is not an infrequent occurrence. Many reasonably careful and prudent persons have sustained such losses. Benedetto was neither prudent nor careful, for after Lichenstein, to whom he exhibited the receipt for examination in aid of a proposed loan of money, returned it to him, he carelessly put it into his pocket, so Lichtenstein says. Besides, he lost money at the same time and gave notice of the fact at once in a Pitts-

burgh newspaper and produced the receipt for the amount paid for the advertisement, and promised to obtain and file the advertisement itself but did not do so.

There are other circumstances immediately associated in time and place with the main and incidental transactions, which while not conclusive throw some light upon the necessitous demands made upon the plaintiffs for money. Whether they came possessed of property of value when they arrived from Italy there is nothing in the record to show. The defendant, their brother-in-law, permitted one of them to join with him in the saloon business at Thomas and later the other one. In 1913 plaintiffs began the erection of a large three story brick building in Thomas for business purposes. They say they did not need the money which Benedetto insists he paid them, but had laid by funds sufficient to defray the expenses incident to that enterprise; wherefore they deny that they needed his assistance and that he contributed anything thereto by repaying what he owned them. If their testimony be true, they have acquired within the limited time since their departure from Italy valuable real and personal property free and acquit of encumbrances from money earned in the prosecution of business in which they were interested jointly with him, a settlement of which is also in litigation.

The release purports to have been acknowledged by the Di Baccos before W. A. Jones, a justice of the peace of Tucker County, and although it is unnecessary, indeed unusual, to affix a seal to a certificate of acknowledgment of a recordable instrument, the official seal of Jones as justice was impressed upon the paper or indented into it. He does not recall the presence of the plaintiffs in his office for the purpose of acknowledging the release or for any other purpose at the time it is claimed they did appear, or that he took and certified the acknowledgment and affixed the seal which he admits he had; but he does not expressly deny that the parties thereto were in his office at that time or that he took and certified the acknowledgment. The most he says is that he does not remember the incident. Thomas, the constable, says he then was in the office of Jones and that neither Benedetto nor the Di Baccos were there while he was present

during the time fixed by the defendant. However, Smith, who was familiar with the signature of Jones, says that although he did not examine it carefully, he would have done so if there had been any suspicion in his mind as to the genuineness of Jones' signature. Colebank, the clerk, who admitted the release to record and recorded it, knew the signature of Jones and its peculiarities and testifies that the latter were such as to impress the mind of anyone who saw the signature, and expressed the opinion that if there had been anything about it sufficient to create a suspicion of its genuineness, he would not have admitted the paper to record without first making some effort to ascertain whether the signature was real and genuine.

There are other facts and circumstances of an evidentiary character some of which are confirmatory and some more or less contradictory of what has been said, but all of which have been examined and considered with the result that we are constrained to reverse the decree complained of and enter here such a decree as we think the circuit court should have entered, namely, one granting the relief prayed for by defendant in the cross bill answer; and such will be the decree.

*Reversed; decree for defendant.*